NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRED U. ANDES<br><br>         Plaintiff,<br><br>         v.<br><br>NEW JERSEY CITY UNIVERSITY, FORMERLY KNOWN AS JERSEY CITY STATE COLLEGE; JOHN DOES 1-10 and ABC CORPORATIONS 1-10<br><br>         Defendants. | Civil Action No.: 07-5521 (PGS)<br><br>**OPINION** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on Defendant New Jersey City University's ("NJCU") motion for summary judgment. Plaintiff, Fred U. Andes ("Andes"), alleges that NJCU has discriminated and retaliated against him based upon race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq*. ("Title VII") and the New Jersey Law Against Discrimination ("LAD").

**I.**

Andes is an Asian-American, of Filipino ancestry, and has been employed by NJCU since 1993. Initially, Andes was hired for a one-year temporary position as an assistant professor in the sociology department. On or about July 1994, Plaintiff was offered and accepted a permanent position in the same department as an assistant professor, tenure track. Every year, from 1994 to

1

1998, Andes would apply to the Department of Personnel Committee for reappointment. President Hernandez and the Vice President for Academic Affairs approved his application for reappointment each year, and the Board of Trustees subsequently confirmed his reappointment during these four years. On December 15, 1997, the Board of Trustees accepted President Hernandez's recommendation that Andes be reappointed for the following year with tenure, effective September 1, 1998. In 2003, Plaintiff was promoted to the rank of Associate Professor, based upon President Hernandez's recommendation and the Board of Trustee's approval.

Andes alleges that in approximately December 2002, NJCU posted an opening for Dean of Graduate Studies and Continuing Education. Andes applied for this position, which is part of the focus of the instant lawsuit. Andes, at this point in time, was still an assistant professor. On or about April 15, 2003, Plaintiff was informed by the Vice President of Academic Affairs that the dean position was to be discontinued as a result of financial difficulties at NJCU. On or about August 2003, Andes learned that Dr. Catherine Shevey was named Acting Dean of Graduate Studies and Continuing Education, the position that he believed was discontinued. Andes alleges this was purposefully executed in order to bypass the search and application process in order to prevent him from a promotion to the dean position. Andes believes his national origin was the reason the search for a dean was discontinued.

On February 24, 2004, Andes filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based upon his race and national origin. In January 2005 the EEOC dismissed his claim of discrimination, and issued Andes a right to sue letter.

On or about March 1, 2005, Andes applied for a promotion to the rank of full professor.

2

Pursuant to the polices and procedures of the NJCU, a University Promotions Committee ("UPC") reviews all the applicants and then submits a list of recommended applicants to NJCU's president. The UPC is comprised of seven tenured faculty members (four appointed by the union and three appointed by the president). The role of the UPC is to issue annual recommendations for faculty promotions to the president.[1]

Applicants must meet the following criteria to be promoted to full professor:

> The candidate will provide evidence of the award of the doctorate or other appropriate terminal degree from an accredited institution in an appropriate field of study and eight (8) years of professional experience. The candidate must also demonstrate outstanding performance in scholarly/creative/professional activities with a strong record of teaching effectiveness and service to the University/community, or outstanding accomplishments in teaching with strong performance in scholarly/creative/professional work and service to the University/community. The level of accomplishments in scholarly/creative/professional work, teaching, and service must exceed that required for the associate professor.
>
> The candidate's achievement must provide evidence of a consistent pattern of academic leadership which has significant impact on the students, University, and profession. Excellence in teaching, scholarly/creative/professional achievement and service shall be determined by application of the criteria and standards for performance as set forth in Appendix B.

(Faculty Promotions Procedure, Affidavit of Pamela Mosley Gresham ("Gresham Aff.") Ex. U.)

On or about May 13, 2005, Dean Liza Fiol-Mata advised the UPC that she did not recommend that Andes be promoted to full professor. Andes received a copy of the memorandum

---

[1] Since this peer review process for promotions was initiated in 2002, the president has recommended to the Board of Trustees every faculty member recommended to him by the UPC. There is no evidence he has ever waived from this practice, however, Andes avers this is not the case.

that Dean Fiol-Mata sent to the UPC. In the end, Andes was denied a promotion to full professor. He was not on the recommended list of applicants for promotions that was sent to the president by the UPC, and his application was terminated. Defendants state that the reason he was not promoted is that in "the professional judgment of his peers on the UPC and of the Dean of his college," Andes's application did not "demonstrate outstanding performance in scholarly/creative/professional activities with a strong record in teaching effectiveness and service to the University/community or outstanding accomplishments in teaching with strong performance in scholarly/creative/professional/work and service to the University/community." Andes argues that this was a false reason for not promoting him because he met all the substantive requirements for the position of full professor.

On or about April 3, 2006, NJCU issued a university-wide email listing the faculty promotions for the upcoming year. (*See* Gresham Aff. Ex. A.) As noted, Andes was not included in this list. That year, the UPC considered thirty-one (31) faculty candidates seeking promotions. There is no dispute that this group of candidates was diverse as to gender, race and ethnicity. Twelve (12) of the thirty-one (31) candidates were applying for a full professor position, as was Andes. There is also no dispute that among these twelve (12) candidates were applicants of diverse backgrounds, including gender, national origin, and race. In the end, three applicants were granted promotions to the rank of full professor. These individuals were Marilyn Ettinger (Female, Caucasian), Afaf Shalaby (Female, Caucasian) in the business administration department, and Robert Hamburger (Male, Caucasian) in the English department.

Andes alleges in the Complaint that only "Non Asian-American, Non-Filipino personnel were promoted." (Compl. ¶ 16.) Further, Andes alleges that candidates were promoted who did not

4

meet the academic requirements for full professor. For example, Andes argues that because Professor Ettinger did not hold a Ph.D. or "equivalent terminal degree" in her field she should not have been promoted. Defendants counter that in 1992, Professor Ettinger followed NJCU's procedures for establishing that her qualifications (a M.S. in business administration, her C.F.A. education and license and additional professional experience) were equivalent to a "terminal degree" in her field, which is finance. Andes does not dispute this because he was not at NJCU in 1992.

Andes also testified that another professor, Dr. Leon Jololian told him that Dr. Morteza Aabdollah (a member of the UPC) informed him in passing conversation that "Fred [Andes] will never be promoted." Further, Andes argues that two of the seven members of the UPC (Professors Cordelia Twomey and Jane Steuerward) never received Andes's application packet to review and did not even know that Andes was an applicant to be considered. Additionally, Andes alleges spoliation–that all the UPC members were instructed to destroy their notes from UPC meetings at the end of the process, which they did according to University policy.

On or about July 7, 2006, approximately three months after being denied the promotion to full professor, Andes filed a second Charge of Discrimination with the EEOC, claiming that he had been retaliated against for filing the first petition with the EEOC, and that he was being discriminated against for both his race and national origin.[2] On August 24, 2007, the EEOC investigator on his case issued Andes a letter informing him that he was unable to conclude that a violation of federal law had occurred. On the next day, the EEOC issued him a right to sue letter.

---

[2] Andes testified at his deposition that President Hernandez is the only individual he believes discriminated against him. Additionally, once the EEOC complaint was filed NJCU's Affirmative Action Office undertook its own investigation into Andes's charges with regard to all the promotion decisions. The university's affirmative action officer concluded that the promotion decisions were not based on any unlawful motivation.

## II.

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact, and that the evidence establishes the movant's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of fact exists only if a reasonable jury could return a verdict for the nonmovant, and it is material only if it may affect the outcome of the suit based upon substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir.2004) (quoting *Anderson*, 477 U.S. at 255).

After the movant has satisfied this burden, the non-moving party must establish that a genuine issue of material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir.1985). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48.

## III.

Discrimination claims brought under Title VII must be analyzed according to the burden-shifting framework which was set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified in *Texas Dep't of Cmty. Affairs v. Burdine*, 450

U.S. 248 (1981), and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).[3] The framework consists of three steps. First, a plaintiff must present sufficient evidence to support a prima facie case of discrimination. *Hicks*, 509 U.S. at 506. Generally, to establish such a prima facie case, the plaintiff must show that (1) he is a member of a protected class; (2) he is qualified for the position in question; (3) he suffered from an adverse employment decision; and (4) the employer sought to or did fill the position with a similarly qualified person who was not a member of the protected class. *McDonnell Douglas*, 411 U.S. at 802.[4]

Once the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *See Hicks*, 509 U.S. at 507; *Burdine*, 450 U.S. at 254; *McDonnell Douglas*, 411 U.S. at 802.

If the defendant satisfies this burden, the reviewing court must proceed to the third step. At this stage, the burden of production shifts back to the plaintiff, who must come forward with admissible evidence showing that the defendants' articulated, nondiscriminatory reasons were not the true reasons for the adverse action, but merely a "pretext for discrimination." *See Hicks*, 509

---

[3] Plaintiff's LAD claim is analyzed under the same federal standards that apply to Title VII, as the Third Circuit and New Jersey courts have recognized that they are "parallel" statutes with general uniformity. *Hailey v. City of Camden,* 650 F. Supp. 2d 349, 355 (D.N.J. 2009) (citing cases that apply same standards to Title VII and NJ LAD claims). *Accord Waldron v. SL Industries, Inc.*, 56 F.3d 491, 504 (3d Cir. 1995) ("[T]he New Jersey Supreme Court has not only adopted the *McDonnell Douglas* framework for evaluating discrimination cases based upon indirect evidence, but has consistently looked to federal courts for guidance about the application of the shifting-burdens analysis.") (internal citations omitted).

[4] When applying *McDonnell Douglas*, the precise elements of the prima facie case vary based on the context of the case and were not intended as rigid or unbending. *Lynch v. Robertson*, 2007 U.S. Dist. LEXIS 60835, at *28 (W.D.Pa. Aug. 20, 2007) (citations omitted). The Third Circuit has indicated that the elements of the prima facie case are not universal and can be tailored to fit the specific context of the case. *Id.* at *28 (citations omitted).

U.S. at 507-08; *Burdine*, 450 U.S. at 253.

A plaintiff will satisfy this burden by providing evidence that would cause a fact finder to disbelieve the reasoning articulated by the defendants or believe that invidious discriminatory reasons were more likely than not a motiving cause of the defendant's actions. *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir.1994). Although the evidentiary burdens shift between the plaintiff and the defendants, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

### IV.

In weighing the evidence in the favor of the Plaintiff, the Court finds that Andes has established a prima facie case of discrimination. As such, the burden shifts to NJCU to articulate a legitimate and nondiscriminatory reason for its actions. In that regard, NJCU's reason is that Andes was less qualified than the candidates who were promoted. NJCU asserts that "it was well within NJCU's traditional management prerogatives to decide that Andes's qualifications did not fit with the qualifications they were seeking." From NJCU's perspective, it was a necessary management decision that was made according to appropriate procedures; the number of promotions is driven by budget limitations. The UPC cannot promote more individuals than the budget allows. In the Fall 2006, there were limited promotions available. There were thirty-one candidates for twelve promotion slots across all positions, of whom twelve candidates were applying for full professor. In the end, nine candidates were promoted to assistant professor and three candidates were promoted to full professor.

A comparison to the three candidates who were promoted aptly demonstrates that each was at least as qualified as Andes. Moreover, each candidate promoted was in the position of associate

professor longer than Andes,[5] and a review of each candidate demonstrates that they were all qualified for the promotion for full professor.[6] Moreover, Dean Fiol-Mata, who was the dean of Andes's department, submitted an independent letter to the UPC advising that she did not recommend Andes for promotion to full professor.[7] These are sufficient non-discriminatory reasons for the promotion decision. Thus, the burden shifts to Andes under *McDonnell-Douglas.*

In the third step under the burden-shifting framework, Andes must show admissible evidence demonstrating that defendant's nondiscriminatory reasons were only a pretext for unlawful discrimination. In that regard, Andes contends that Professors Twomey and Steuerward never received his application, and that they testified at depositions that they were not even aware Andes was an applicant for the position. During Professor Steuerward's deposition she stated that she could "not recall" whether or not she reviewed Andes's application. This lack of memory of the process does not amount to affirmative evidence of discrimination or non-receipt of the application file. As to Professor Twomey, she testified that she was unaware that Andes was an applicant, and she did not provide a score for Andes. However, other evidence shows her testimony is mistaken. For instance, Professor Riggs (Chairman of the UPC) emailed the UPC committee members, including Professors Steuerward and Twomey, a list of candidates for promotion. The list included Andes.

---

[5] At the time the UPC reviewed candidates, Andes had been an associate professor for less than three years.

[6] Andes alleges that Professor Ettinger was not qualified; however, Andes submits no admissible evidence that NJCU's determination in 1992 that her qualifications were the "doctrinal equivalence" of a Ph.D were improper. Andes concedes he has no personal knowledge of the process Profession Ettinger participated in to satisfy the NJCU requirements for "doctrinal equivalence."

[7] Dean Fiol-Mata is not a party to this lawsuit.

On April 30, 2005, Professor Twomey emailed Professor Riggs with her list of candidates and corresponding scores, including Andes.  Accordingly, Professor Twomey considered Andes as a candidate despite her lack of memory at depositions.  Because there were thirty-one applicants, it is not surprising that two of the UPC members could not remember reviewing Andes's application.

Andes's remaining allegations are comprised of hearsay that are not supported by the evidence on the record.  Andes alleges that Dr. Leon Jololian informed him that Dr. Aabdollah (a UPC member) told him that "Fred [Andes] will never be promoted." This sentence is double hearsay and is clearly inadmissible at summary judgment. *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment.")  Moreover, Dr. Aabdollah was deposed in this case and denies having made this comment.  When asked if he spoke to Dr. Jalolian about Andes he remarked "That must be a joke.  I never–we never even–Jalolian and I didn't even, don't even, in a talking term, let alone talking about Promotions Committee . . . Definitely No."  (Gresham Aff. Ex. K 775:25-5.)  In support of his allegation, Andes conclusorily alleges that Dr. Aabdollah and President Hernandez are friends.  Regardless of its little bearing on the issue of discrimination, the evidence on the record supports the opposite conclusion.  Dr. Aabdollah testified that he knows who President Hernandez is, but has never actually met him in a social setting.  Moreover, Dr. Aabdollah testified that he was appointed to the UPC not by President Hernandez (as alleged by Andes), but rather by the union.

Andes has provided no admissible evidence that NJCU's articulated, nondiscriminatory reasons were only a pretext for unlawful discrimination.  The Court grants NJCU summary judgment on Andes's discrimination claim.

Andes's Retaliation Claim Under Title VII.

The burden-shifting requirements of *McDonnell Douglas* similarly apply to retaliation claims. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir.1997).

In this case, the third prong of the prima facie case requires that a plaintiff establish a causal connection between the protected activity (filing an EEOC complaint) and the adverse employment action (denial of promotion) by "circumstantial evidence, such as temporal proximity, a pattern of antagonism, and pretext." *Kachmar v. SunGard Dada Systems*, 109 F.3d 173, 177 (3d Cir.1997); *accord Barnes v. Office Depot, Inc.*, 2009 WL 4133563, at *11 (D.N.J. Nov. 24, 2009). In *Barnes*, the court held that "proof of a causal connection between a protected activity and an adverse employment action involves a highly specific inquiry into the motives of an employer." 2009 WL 4133563, at *11(citing *Kachmar,* 109 F.3d at 177). Further, "[t]emporal proximity can serve as circumstantial evidence 'sufficient to raise the inference that [the plaintiff's] protected activity was the likely reason for the adverse action.'" *Id. See also Neely v. U.S. Postal Service,* 307 F. App'x. 681, 684-685 (3d Cir. 2009); *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir.2007); *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir.1990).

Andes argues that there is a temporal proximity between his first EEOC complaint and his denial for promotion to full professor. Andes received the EEOC right to sue letter on January, 27, 2005, and on March 1, 2005 he submitted his application for promotion. Andes contends that this approximate one-month time period infers that retaliation occurred against him in his effort to obtain the promotion. Andes's argument on "temporal proximity" is off the mark. Andes improperly construes the time period from the date he received a "right to sue" letter to the date he applied for a promotion. A closer look at the timing of the events in question demonstrates this is misplaced.

Andes filed his EEOC complaint on February 2, 2004. He received the EEOC right to sue letter a year later on January 27, 2005. Next, Andes submitted an application for promotion on March 1, 2005. As evidenced by the record, an extensive process is undertaken and his application is denied on April 3, 2006. The case law is clear that the time period in which to show temporal proximity extends from the date of the protected activity to the date of the adverse employment action. *See Samuels v. Postmaster General,* 257 F. App'x. 585, 587 (3d Cir. 2007). *Moore v. City of Philadelphia,* 461 F.3d 331, 351 (3d Cir. 2006) (holding that courts consider the time period "between the protected activity and alleged retaliatory actions to prove causation"). Here, the filing of the EEOC complaint was the protected activity and the denial of the promotion was the adverse employment action.[8] This would make the time period two years and two months.[9] It is not within the temporal proximity of the filing of an EEOC complaint.

The United States Supreme Court has held that even a three-month period from issuance of an EEOC right to sue letter to the adverse employment action is insufficient. *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001). In *Clark County School District*, the Supreme Court stated that if one assumed the employer was aware of the issuance of the right to sue letter, then one must also assume the employer knew about the EEOC complaint when it was filed because "both Title VII and its implementing regulations require that an employer be given notice within 10 days

---

[8] It would be perverse if the Court were to consider the date Andes applied for a promotion as the "adverse employment action." If that were the case, every Title VII plaintiff could manipulate their retaliation allegations simply by applying for a new position immediately following an EEOC decision.

[9] Even if the Court construed the time period from the date Andes received the EEOC right to sue letter to the date he was denied a promotion, it would still be a time period of approximately fourteen months, which is not unusually suggestive.

of filing, 42 U.S.C. §§ 2000e-5(b), (e)(1); 29 CFR § 1601.14 (2000)." 532 U.S. at 273. Thus, while the Supreme Court affirmed that the three-month gap was insufficient, the actual time period should have been twenty months from the date of the EEOC filing. The Court held that "action taken (as here) 20 months later suggests, by itself, no causality at all." *Id.* A majority of courts have held that the time period must be very close to make an inference supporting a retaliation claim under Title VII.[10]

The Third Circuit's decision in *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989), demonstrates a case where the "temporal proximity" factor was significant. In *Jalil*, the plaintiff was terminated two days after the defendant learned of the EEOC complaint. *Jalil* is far different than the facts here. Andes has not provided any evidence that President Hernandez was notified of the EEOC complaint or that there existed a "pattern of antagonism" directed towards him as a result of the EEOC complaint.[11] *See Samuels,* 257 F. App'x. at 587 (rejecting retaliation claim because plaintiff had not "identified evidence of antagonism suggesting that she had been terminated for filing an EEOC claim").

---

[10] *See, e.g.*, *Walsh v. Wal Mart Stores, Inc.*, 200 F. App'x. 134, 136 (3d Cir. 2006) (eight-month time period between filing of EEOC claim and adverse employment action insufficient to establish causation); *Williams v. Philadelphia Housing Auth. Police Dept.*, 380 F.3d 751, 760 (3d Cir. 2004) (two-month gap between filing and adverse employment action was too long to allow an inference of causation); *Morrissey v. Luzerne County Cmty. College*, 117 Fed. Appx. 809, 816 (3d Cir.2004) (six-month time period insufficient)*; Richmond v. ONEOK, Inc.*, 120 F.3d 205(10th Cir. 1997) (three-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four-month period insufficient).

[11] President Hernandez testified that he recalls a complaint was filed with the EEOC, but he does not recall the outcome of the EEOC complaint. Thus, as directed by the Supreme Court in *Clark County*, the Court presumes that President Hernandez was notified of the EEOC complaint at the time it was filed. Moreover, President Hernandez testified that he only became aware that Andes applied for a promotion as a result of the current litigation.

Andes fails to demonstrate that the time period here was "unusually suggestive." Additionally, Andes fails to proffer any evidence of "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for [the adverse employment action], or any other evidence in the record sufficient to support the inference of retaliatory animus." *Clark County Sch. Dist.*, 532 U.S. at 279-81; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ( "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.")  As stated above, Andes alleges two inadmissible, hearsay statements by Dr. Aabdollah, which he denied at deposition.[12]  Andes has not offered any evidence that causally relates his denial of a promotion to his filing of the EEOC complaint, and the twenty-six month gap between the events is insufficient to allow his retaliation claim to survive summary judgment.

## V.

For the foregoing reasons, Defendant's motion for summary judgment is granted.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

March 17, 2010

---

[12]  In addition to the double-hearsay statement with respect to Andes's promotion articulated above, Andes alleges that Dr. Aabdollah asked him why he filed an EEOC complaint, which Dr. Aabdollah testified never occurred.  Further, Dr. Aabdollah testified that at the time he evaluated Andes as a member of the UPC he was unaware that Andes filed an EEOC Complaint.  Regardless, inadmissible hearsay statements are not considered at summary judgment.